STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO. 20 CVS 8415

SUSAN K. CARPENTER, Trustee of the
H. Joe King, Jr. Revocable Trust, on
behalf of itself and all others similarly
situated,

Plaintiffs,

v.

WILLIAM DOUGLAS MANAGEMENT,
INC., and NEXTLEVEL ASSOCIATION
SOLUTIONS, INC. d/b/a
HOMEWISEDOCS.COM,

Defendants.

**AMENDED CLASS ACTION
COMPLAINT**
Jury Trial Demanded

## Nature of the Action

1.      This action involves unlawful and unreasonable charges of real estate "transfer fees" by Defendants William Douglas Management, Inc. ("William Douglas") a property management company, and NextLevel Association Solutions, Inc. ("HomeWise"), (collectively, "Defendants").

2.      Together, Defendants systematically and unlawfully charge exorbitant "transfer fees" in the hundreds of dollars to sellers of residential real estate properties in order for the ability to sell their homes.

3.      In particular, Defendants charge the transferor (e.g., the seller) of real property a "transfer fee" to provide a statement of unpaid assessments as well as for services that exclusively benefit the transferee (e.g., the buyer). A statement of

unpaid assessments certifies the amount that the selling homeowner owes in home owners associations ("HOAs") or condo owners associations ("COAs") (collectively, "OAs") assessments.

4.    For all practical purposes, a homeowner whose home is part of an OA cannot sell the home without a statement of unpaid assessments.

5.    For example, a title insurance company will not certify the seller's title is free and clear of any liens or other encumbrances, and the closing cannot occur.

6.    Defendants charge unreasonably high fees in order to provide statements of unpaid assessments, and represent or cause to represent to homeowners that the unreasonably high fees are legally "due" from them.

7.    However, Defendants have no legal basis to charge unreasonably high fees for statements of unpaid assessments.

8.    In essence and as discussed herein, Defendants merely make an arbitrary decision as to what to charge homeowners, claim the amount is legally "due", and collect payment.

9.    Plaintiff initiated this action to recover all unlawful "transfer fees" as well as all other statutory damages, penalties, and amounts they are entitled to as a result of Defendants' unlawful activity.

### Parties

10.    Susan K. Carpenter, Trustee of the H. Joe King, Jr. Revocable Trust ("Ms. Carpenter") is currently a citizen and resident of Charlotte, North Carolina.

11. At all times relevant to this complaint Ms. Carpenter acted on behalf of the H. Joe King, Jr. Revocable Trust, and not in her individual capacity.

12. Further, when any amounts were charged to Ms. Carpenter or paid by Ms. Carpenter, such amounts were charged to and paid on behalf of the H. Joe King, Jr. Revocable Trust and not to or by Ms. Carpenter individually.

13. On April 2, 2020, Plaintiff sold a home located at 1236 Archdale Drive, Unit D, Charlotte, North Carolina 28217.

14. In order to sell the home, Plaintiff was charged $150 for "HOA Transfer Fee to William Douglas Property Management".[1]

15. William Douglas charged Plaintiff Resale Fees for the simple confirmation that the property owner was current on the payment of assessments to the OA at the time of the sale of the property.

16. On April 3, 2020, Ms. Carpenter sold a home located at 8917 Hunter Ridge Drive, Charlotte, North Carolina.

17. In order to sell the home, Plaintiff was charged a total of $215 for "Closing Letter and Documents Package (Including Transfer Fee)" by William Douglas. In addition, in order to sell the home, Plaintiff was also charged a total of $40 for "Closing Letter and Documents Package (Includes Transfer Fee)" by HomeWise.

---

[1] The April 2 and April 3 fees, as well as those routinely charged to putative class members, will be referred to herein as "Resale Fees" or "transfer fees".

3

18.    Defendants charged Plaintiff Resale Fees for the simple confirmation that the property owner was current on the payment of its assessments to the OA at the time of the sale of the property.

19.    Both the homes located at 1236 Archdale Drive and 8917 Hunter Ridge Drive were owned by the H. Joe King, Jr. Revocable Trust.

20.    William Douglas is a corporation organized under the laws of the State of North Carolina, with its principal office in Charlotte, North Carolina. William Douglas provides property management services to OAs throughout North Carolina, including Plaintiff's former OAs.

21.    NextLevel Association Solutions, Inc. d/b/a HomeWiseDocs.com ("HomeWise") is a corporation organized under the laws of the state of California, with its principal office in Fairfield, Connecticut. HomeWise provides Internet-accessible software based on automated processing systems that enable property managers, including William Douglas, to provide data and documents for real estate transactions.

## Venue & Jurisdiction

22.    The subject matter jurisdiction over this cause and personal jurisdiction are conferred upon and vested in this Court under and by virtue of G.S. §§ 1-75.4, 7A-240, and 7A-243.

23.    Venue for this cause is properly laid in this Court pursuant to and in accordance with G.S. § 1-82.

## The Role of Property Management Companies for OA Properties

24.     OAs routinely enter into agreements with property management companies, like William Douglas, to perform various services to the OAs.

25.     The services covered by property management agreements often include responsibilities such as: vendor hiring and management; cleaning and maintenance of amenities and common areas; preparation of budgets and guided advice for financial planning; regular inspection of properties to monitor and enforce compliance with community covenants; quarterly education for board members; and collection and tracking of assessment payments. William Douglas contracts with OAs for a specific fee to cover these services.

26.     William Douglas promotes itself as a "comprehensive" management firm, offering to provide all of the above services to the OAs it enters into agreements with, including Plaintiff's former OAs.

27.     William Douglas does not enter into agreements with homeowners whatsoever.

28.     In particular, William Douglas touts its abilities to manage OAs' assessment and collection policies, as well as its technological sophistication:

# **HOA** MANAGEMENT SERVICES
## **WILLIAM DOUGLAS IS A LEADER IN TECHNOLOGY** [2]

29.     To manage OAs' assessment and collection policies, William Douglas utilizes software to track the collection of OAs' assessments.

---

[2] https://wmdouglas.com (last visited June 5, 2020)

30.    William Douglas' community management services includes the collection and management of property owner information:



31.    William Douglas generates reports that reflect the status of unpaid assessments as part of its normal and ordinary course of business.

32.    The unpaid assessment statements will either list an amount owed or reflect a zero balance.

33.    Because of its regular tracking of assessment payments, the process of generating unpaid assessment statements is simple and inexpensive for William Douglas.

---

[3] https://wmdouglas.com/community-management/ (last visited June 5, 2020)

34. Upon information and belief, obtaining a statement of unpaid assessments merely requires a handful of keystrokes, and approximately five minutes or less of an employee's time.

35. After a handful of keystrokes and five minutes or less of time, William Douglas's software produces a statement of unpaid assessments.

### The Role of HomeWise

36. William Douglas is able to provide a statement of unpaid assessments so easily primarily because of HomeWise.

37. HomeWise developed and owns internet-accessible software that enables users (which are typically property management companies such as William Douglas) to electronically store OA governing documents, and to track the collection of assessments and other related information.

38. HomeWise enters into service agreements with property management companies, like William Douglas, for the use of HomeWise's software.

39. HomeWise prides itself on delivering services that provide "efficiency and responsiveness" to property managers.[4]

40. Defendants require that requests for statements of unpaid assessments be routed first through HomeWise. When a request for a statement of unpaid assessments is made through HomeWise, a William Douglas employee will receive the request, confirm that the homeowner does not have any unpaid assessments to the OA, and then documents that in the HomeWise system. A form

---

[4] *See* https://www.homewisedocs.com/solutions/owners-and-executives (last visited September 22, 2020)

document, that Defendants title "Closing Letter" (which is a statement of unpaid assessments) is then sent to the closing attorney who requested the statement of unpaid assessments through HomeWise.

41.     Homeowners in an OA managed by William Douglas do not contract, negotiate, or bargain with HomeWise for any of the services HomeWise provides to William Douglas.

42.     HomeWise and William Douglas invoice homeowners directly together, but as separate line items for services provided, each describing the charge as "Closing Letter and Documents Package (Includes Transfer Fee)". Defendants assert that these charges are "due" from homeowners, and require that homeowners pay these charges as part of the real estate closing.

## The Role of Statements of Unpaid Assessments in Real Estate Transactions

43.     Defendants provide statements of unpaid assessments as part of the sale, gift, conveyance, assignment, inheritance, or other transfer of an ownership interest in real property located in North Carolina.

44.     When Defendants provide statements of unpaid assessments upon the transfer of an ownership interest in real property as described above, Defendants charge Resale Fees payable upon the transfer of the interest in real property or payable for the right to make or accept such transfer.

45.     Defendants charge Resale Fees for the preparation of statements of unpaid assessments at the time of closing and requires Resale Fees to be paid at the closing of a real estate transaction.

46. For all practical purposes, a homeowner whose home is part of an OA cannot sell the home without a statement of unpaid assessments.

47. Absent a statement of unpaid assessments showing a zero balance, a closing attorney will not certify to a title insurance company that the title is free and clear of any OA liens for assessments.

48. In addition, a statement of unpaid assessments showing a zero balance is often a condition of a lender in order to disburse loan funds.

49. Under either scenario, a real estate transaction cannot close until a statement of unpaid assessments is provided by Defendants.

50. In other words, a statement of unpaid assessments is an indispensable component of a residential real estate transaction involving properties within an OA.

51. In particular, Plaintiff's closing attorney would not have certified to Plaintiff's title insurance company that the title was free and clear of any OA liens for assessments absent a statement of unpaid assessments, and a lender would not have disbursed loan funds absent a statement of unpaid assessments demonstrating a zero balance.

### Defendants' Charges for the Preparation of Statements of Unpaid Assessments

52. Despite the ease with which Defendants can produce a statement of unpaid assessments and the minimal labor it requires, Defendants arbitrarily charge individuals like Plaintiffs and the Class members $175 or more.

53. The vast majority of the fee charged by Defendants represents pure profit for them, only benefits Defendants, and exceeds the reasonable expectation of the Plaintiff and the Class members.

54. Plaintiff and the Class have no manner in which to negotiate the amount of the fee charged, yet Plaintiff and the Class members are not be able to close on the sales of their homes unless they pay these unreasonable fees to Defendants.

55. Upon information and belief, Defendants charge a fee for the statements of unpaid assessments to Plaintiff and the Class without regard to individual circumstances.

56. Upon information and belief, Defendants performed no analysis regarding the actual cost to provide the statement of unpaid assessments when establishing the rate to charge Plaintiff and the Class.

57. By charging unreasonable and unlawful "transfer fees" to transferors' of real property, Defendants effectively implement a sales penalty.

58. While the transfer fees are ostensibly to provide a statement of unpaid assessments to the transferor of real property, a portion of the fee is actually attributable to services rendered to the transferee of the property.

59. As part of the transfer fee charged to a selling homeowner, Defendants provides a number of post-sale services and activities exclusively for the buying homeowner that provide no benefit whatsoever to the selling homeowner.

60.    These services include updating new owner information, generating welcome kits, and mailing information to the buying homeowner.

61.    Defendants do not disclose to the seller that they are charging the seller for services rendered to the buyer.

**Defendants Have Only Two Potential<br>Justifications for Charging Transfer Fees.**

62.    There are only two potential ways for an entity, like Defendants, to lawfully charge Plaintiff and the putative class members with fees for statements of unpaid assessments.

63.    First the "transfer fee" could be charged under G.S. § 39A-1.1 *et seq*. Second, the "transfer fee" could be charged under G.S. §§ 47F-3-102(13) or 47C-3-102(12).

64.    Here, William Douglas has claimed through responses to Plaintiff's Requests for Admission that it had authority for this charge under G.S. § 39A-2(2)(h). *See* **Exhibit A**, p. 4.

65.    As explained below, Defendants actually had no legal basis whatsoever to charge for the "transfer fees" which they charged Plaintiff and the putative class.

*Defendants Lack Authority to Charge for Statements<br>of Unpaid Assessments under G.S. § 39A-1.1 et seq*

66.    General Statute 39A-1 *et seq*. (the "Transfer Fee Prohibition Act") was enacted in 2010. The Transfer Fee Prohibition Act did not state a new public policy in North Carolina relating to real property.

67. Rather, it was a restatement of North Carolina's policy toward real property found in the 1973 Real Property Marketable Title Act.

68. In 1973, the North Carolina legislature made it clear that all land in North Carolina should be "made freely alienable and marketable."

69. An entity that imposes a transfer fee as part of the sale of real property is restricting the alienability and marketability of title.

70. The Transfer Fee Prohibition Act formalized the prohibition against transfer fees in North Carolina.

71. The Transfer Fee Prohibition Act lists the reasons why transfer fees violate this public policy of North Carolina, including because such fees impair "the marketability of title, impair "the transferability in real property" and constitute an "unreasonable restraint[] on alienation..." *See* G.S. § 39A-1(a).

72. In order to preserve North Carolina's interest in the marketability of land, the legislature enacted the Transfer Fee Prohibition Act in 2010.

73. That Act defines a "transfer fee" in G.S. § 39A-2 as:

> a fee or charge payable upon the transfer of an interest in real property or payable for the right to make or accept such transfer, regardless of whether the fee or charge is a fixed amount or is determined as a percentage of the value of the property, the purchase price, or other consideration given for the transfer.

74. That definition continues, and identifies ten specific fees that are not considered transfer fees within the definition of G.S. § 39A-2.

75.    In other words, if a fee meets the definition of a "transfer fee" in G.S. § 39A-2(2) but does not meet any of the exceptions listed in G.S. § 39A-2(2)(a)-(j), then the fee is an unlawful transfer fee.

76.    Relevant here is the exception identified in G.S. § 39A-2(2)(h), which excludes from the definition of a transfer fee:

> Any reasonable fee charged for the preparation of statements of unpaid assessments pursuant to G.S. § 47F-3-102(13) or resale certificates or statements of unpaid assessments pursuant to G.S. § 47C-3-102(12).

77.    The limitation of the fee to a "reasonable" amount necessarily means that any *un*reasonable fee is a transfer fee within the definition of G.S. § 39A-2.

78.    The enforcement mechanism of the Transfer Fee Prohibition Act is found in G.S. § 39A-3(b).

79.    Under this provision, "[a] person who records a transfer fee covenant, files a lien that purports to secure payment of a transfer fee, *or enters into an agreement imposing a private transfer fee obligation* shall be liable..." G.S. § 39A-3(b) (emphasis added).

80.    Put another way, there are three events that trigger liability: (1) recording a transfer fee covenant; (2) filing a lien securing a transfer fee; and (3) entering into an agreement to impose a transfer fee obligation.

81.    Thus, despite the title of § 39A-1 *et seq.* and the subtitle of § 39A-3, the Transfer Fee Prohibition Act addresses unlawful activity outside of the narrow definition of a transfer fee covenant.

13

82. The available remedies under the Transfer Fee Prohibition Act demonstrates that the breadth of the statute exceeds beyond transfer fee covenants. For example, violation of the Transfer Fee Prohibition Act allows the injured party to recover "damages resulting from the imposition of the *transfer fee obligation*...including the amount of any transfer fee paid by a party to the transfer." G.S. § 39A-3(b)(1) (emphasis added).

83. In addition, the Transfer Fee Prohibition Act "applies to (i) any transfer fee covenant that is recorded after July 1, 2010...*and* (iii) any agreement imposing a *private transfer fee obligation* entered into after July 1, 2010." G.S. § 39A-4(a) (emphasis added).

84. William Douglas admits that it charged Resale Fees pursuant to G.S. § 39A-2(2)(h). *See* Ex. A, p. 4.

85. In other words, William Douglas admits that Resale Fees are "transfer fees" under G.S. § 39A-2(2), but purportedly qualify for an exception under G.S. § 39A-2(h).

86. However, because Defendants charge an *un*reasonable and unlawful amount to provide a statement of unpaid assessments, William Douglas's unreasonable "transfer fees" are transfer fees within the definition of G.S. § 39A-2 and fail to meet any exception listed in G.S. § 39A-2(a)-(j).

### *Defendants Lack Authority to Charge for Statements of Unpaid Assessments under G.S. §§ 47F-3-102(13) or 47C-3-102(12)*

87.     To the extent that G.S. § 39A-1 *et seq.* is inapplicable, the only alternative statutory avenues to charge for statements of unpaid assessments are found in G.S. §§ 47F-3-102(13) and 47C-3-102(12).

88.     General Statute 47F-3-102 provides a list of powers an owners' association can exercise; likewise, § 47C-3-102 provides a list of powers a condominium owners' association can exercise.

89.     William Douglas's property management agreements with OAs allow William Douglas to exercise the powers listed in G.S. §§ 47F-3-102 an 47C-3-102.

90.     HomeWise has no agreement with OAs to exercise the powers listed in G.S. §§ 47F-3-102 an 47C-3-102 on their behalf.

91.     Until recently,[5] OAs under both Chapter 47F and 47C were allowed to charge a "reasonable "fee for providing statements of unpaid assessments. *See* G.S. § 47F-3-102(13) (allowing the association to "[i]mpose reasonable charges in connection with the preparation and recordation of documents, including...statements of unpaid assessments."); G.S. § 47C-3-102(12) (allowing the association to "[i]mpose reasonable charges for the preparation [of]...statements of unpaid assessments.").

---

[5] On July 2, 2020, Session Law 2020-90 was enacted that amended a number of various statutes, including substantively amending G.S. §§ 47F-3-12 and 47C-3-102 to create new subparagraphs that imposed new rights and responsibilities not then covered in the respective statutes. Notably, the "reasonable fee" may not exceed $200, as well as a new "expedite fee" that may not exceed $100. The July 2, 2020, amendment was a substantive amendment with only prospective effect.

92.    The "transfer fee" charged by Defendants to Plaintiff and the putative class members was not reasonable or lawful under either G.S. §§ 47F-3-102(13) and 47C-3-102(12).

93.    Defendants performed no analysis regarding the actual cost to provide the statement of unpaid assessments when establishing the rate to charge for the "transfer fee".

94.    The "transfer fee" charged to Plaintiff is unreasonably and unlawfully high for the services provided, bears no relationship to the actual cost of performing the services, exceeds the reasonable expectation of Plaintiff and class members, represents pure profit to Defendants, and was arbitrarily determined by Defendants.

95.    Because Defendants charge an unreasonable fee for statements of unpaid assessments, Defendants lacks authority under G.S. §§ 47F-3-102 and 47C-3-102 to charge for statements of unpaid assessments.

### *Homeowners Do not Agree to Pay Defendants Unreasonable Fees*

96.    Plaintiff and putative class members do not enter into written or oral contracts with Defendants, and therefore do not agree to the imposition of "transfer fees."

97.    Shortly before closing, Defendants send sellers form written correspondence, sometimes styled "Closing Letter." *See* Ex. B.

98. The Closing Letter declares that the seller is required to pay a "transfer fee" at closing that is "due and payable directly to William Douglas Property Management."

99. William Douglas does not and will not negotiate the amount it charges for a "transfer fee."

100. The Closing Letter also declares that the seller is required to pay a "transfer fee" at closing that is "due" and "payable" directly to HomeWise.

101. HomeWise does not and will not negotiate the amount it charges for a "transfer fee."

102. Prior to claiming that the "transfer fee" is "due," Defendants do not explain or disclose the basis for the fee charged, or the purpose of the fee. Accordingly, Plaintiff and putative class members lack a full knowledge of all facts and circumstances and the means to obtaining such knowledge.

103. Defendants cause the "transfer fee" to appear on required real estate settlement statement(s) alongside the final sales price, taxes, and other legal amounts to create the impression that the "certification fee" is likewise a legal charge when, in reality, it is not a legal charge.

### Defendants' Unlawful Charges to Plaintiff

104. The H. Joe King, Jr. Revocable Trust owned two properties located at 8917 Hunter Ridge Drive, Charlotte, North Carolina (the "Hunter Ridge Property"), and 1236 Archdale Drive, Unit D, Charlotte, NC 28217 Charlotte, North Carolina (the "Archdale Property").

105. The Hunter Ridge Property was located in the Lexington Commons subdivision, which contracted with William Douglas for various property management responsibilities, including those described in this Amended Complaint.

106. One of William Douglas's responsibilities was to collect monthly assessments from property owners in the community.

107. Plaintiff sold the Hunter Ridge Property on April 3, 2020.

108. When she sold the Hunter Ridge Property, Plaintiff was charged a $215 fee from William Douglas. **Exhibit B.**

109. Included in that $215 fee, was a $40 "rush fee," a $25 "Closing Letter Update" fee, and a $150 fee characterized by William Douglas as a "Closing Letter and Documents Package (Includes Transfer Fee)."

110. In addition to the fees charged by Williams Douglas, Plaintiff was also assessed a $40 fee by a company called HomeWise for another item entitled "Closing Letter and Documents Package (Includes Transfer Fee)."

111. In other words, Defendants apparently charged Plaintiff and the putative class for the same services.

112. This made the total amount of Resale Fees that Defendants charged Plaintiffs on the Hunter Ridge Property sale $255.

113. The fees that were charged by HomeWise to Plaintiff are really the charges that William Douglas should be paying to HomeWise for its use of HomeWise's systems. Instead, the Defendants have an agreement to pass these costs on to sellers like Plaintiff.

114. Indeed, William Douglas does not pay HomeWise anything for its use of its software. Instead, HomeWise simply charges consumers like Plaintiff directly for the services that HomeWise renders to William Douglas.

115. HomeWise, recognizing that its double charges could exceed statutory maximums in certain states for the services it provides, states on its website that its "pricing is established with management company approval."[6]

116. Upon information and belief, the "update" fees charged by William Douglas and HomeWise were charged by these entities for re-confirming that Plaintiff was current on assessment payments after the closing of the property was delayed by approximately two weeks.

117. The actions performed in exchange for these $25 and $5 fees, respectively, were the exact same actions taken to initially prepare the statement of unpaid assessments.

118. On April 2, 2020 Plaintiff sold the Archdale Property. The Archdale Property was located in a separate neighborhood that was also managed by William Douglas.

119. In order to sell the Archdale Property, Plaintiff was charged $150 by William Douglas. Again, this was charged to Plaintiff for the simple confirmation

---

[6] https://homewisedocshelp.zendesk.com/hc/en-us/articles/360022452732-What-if-the-price-exceeds-the-state-caps- (last accessed September 22, 2020) (stating in response the frequently asked question "What if the price exceeds the state caps?" that "The pricing is established with management company approval and includes the HomeWiseDocs fee.").

that Plaintiff was current on the payment of assessments to the HOA at the time of the sale of the Archdale Property.

120. The closing attorney for that transaction reflected the fee on the closing statement for the property as "HOA Transfer Fee to William Douglas Property Management." **Exhibit C.** In addition, Plaintiff was charged another $25 fee by HomeWise related to this sale.

121. The Resale Fees are fees charged by Defendants for the preparation of a statement of unpaid assessments and other services.

122. The "Closing Letter," attached as **Exhibit D**, certifies that Plaintiff was current on the HOA dues, owing only the charges for the current month.

123. That fee was purportedly charged by Defendants for providing the statement of unpaid assessments to Plaintiff in verifying that the assessments were current at the time of the sale of the home in all respects constituted a fee charged for preparing a statement of unpaid assessments.

124. In reality, the Resale Fee also includes services that exclusively benefit the buyer of Plaintiff's property.

125. As described above, due to William Douglas's usage of HomeWise's software to track the monthly collection of assessments, it simply took a couple of keystrokes and a matter of minutes to confirm that Plaintiff was not delinquent on its assessments.

126. Upon information and belief, the "Closing Letter Update" and "Closing Letter" attached as **Exhibits B and D** are form documents that HomeWise's

software populates with property-owner specific information maintained in HomeWise's software.

127. Since William Douglas already utilizes that software per its obligations to the OAs it serves, and because it utilizes software provided by HomeWise, William Douglas does not incur any new actual costs related to the determination that property owners such as Plaintiff and other putative class members are current on their assessment payments.

128. Plaintiff did not negotiate, and was not provided an opportunity to negotiate, the amount of the "transfer fee", nor did they possess a full knowledge of all facts and circumstances and the means to obtaining such knowledge as to the "transfer fee."

### Class Action Allegations

129. Pursuant to Rule 23 of the North Carolina Rules of Civil Procedure, Plaintiff brings this action on behalf of a proposed class and subclass defined as follows:

> Class: All individuals who paid fees to William Douglas for the preparation of statements of unpaid assessments pursuant to G.S. 47F-3-102(13) or resale certificates or statements of unpaid assessments pursuant to G.S. 47(c)-3-102(12).

> Subclass: All individuals who paid fees to William Douglas and HomeWise for the preparation of statements of unpaid assessments pursuant to G.S. 47F-3-102(13) or resale certificates or statements of unpaid assessments pursuant to G.S. 47(c)-3-102(12).

130. Excluded from the Class are: (a) any Judge presiding over this action and members of their families; (b) Defendants, any entity in which Defendants have a controlling interest, and Defendants' legal representatives, assigns and successors; and (c) all persons and entities who timely and properly excludes himself or herself from the class.

131. Plaintiff reserves the right to alter the Class definitions as necessary to the full extent allowed by applicable law.

132. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence that individual Class members would use to prove those elements in individual actions alleging the same claims.

*Numerosity*

133. The size of the class and subclass are so large that joinder of all Class members is impracticable as plaintiff is informed and believe that they consist of hundreds, if not thousands of members.

*Commonality*

134. All questions, and their respective answers, concerning the reasonableness of the "transfer fees" charged by Defendants are common to the Class. Whether Defendant's charges violate G.S. § 39A-1 *et seq.* is a question common for all members of the class. Further, the answer to this question will drive other common answers in the litigation, including what a reasonable fee is for Defendants to charge for the provision of its certification that a home seller is

current on its OA assessments. Other common questions of law and fact include, but are not limited to:

    a. Whether Defendants' charges for statements of unpaid assessments and resale certificates violated G.S. §§ 39A-1 *et seq.*, 47F-3-102, and/or 47C-3-102;

    b. Whether Defendants' charges for unpaid assessments and resale certificates were reasonable;

    c. Whether Defendants' charges for unpaid assessments bore any relationship to the actual costs incurred in preparing the statements of unpaid assessments and resale certificates;

    d. Whether G.S. § 39A-2(2)(h) only permits charging of a reasonable fee for the preparation of unpaid assessments when the seller is delinquent on its payment of assessments and resale certificates;

    e. What amount is a reasonable fee for Defendants to have charged for the preparation of unpaid assessments and resale certificates;

    f. Whether Defendants negligently misrepresented the amount they could lawfully charge for unpaid assessment statements and resale certificates;

    g. Whether Defendants had an agreement to charge fees for the preparation of unpaid assessments and resale certificates that exceeded the statutorily allowable amount; and

h. Whether Defendants violated the North Carolina Debt Collection Act by charging for unpaid assessment statements and resale certificates without legal authority.

### Predominance

135. These, and other common questions of law and fact predominate over any individual issues that may be presented, because Defendants have a pattern, practice, and policy of uniformly charging unreasonable and excessive fees for the simple process of certifying that a property seller is current on the payment of their OA assessments.

### Typicality

136. The claims of the Plaintiff are typical of the proposed classes and all are based on the same facts and legal theories, as all such claims arise out of Defendants' conduct in that Defendants has a specific policy of charging unreasonable and excessive fees from each member of the Class.

### Adequate Representation

137. The Plaintiff is an adequate representative of the Class in that the Plaintiff does not have any antagonistic or conflicting claims with other members of the Class.

138. Plaintiff has also retained counsel experienced in the prosecution of complex class actions and consumer litigation.

139. Neither Plaintiff nor counsel have any interests that might cause them not to vigorously pursue this action.

140. Plaintiff is aware of the responsibilities to the putative class and accepted such responsibilities.

*Superiority*

141. A class action is superior to all other available methods for fair and efficient adjudication of this controversy.

142. Plaintiff does not anticipate any difficulty in managing and maintaining this action as a class action.

143. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale, and comprehensive supervision by a single court.

144. Further, Defendants have acted on grounds generally applicable to the proposed class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

### FIRST CAUSE OF ACTION
### Violation of the North Carolina Prohibition on
### Transfer Fee Covenants
### G.S. § 39A-1, *et seq.*

145. Plaintiff incorporates herein by reference each of the preceding paragraphs as if fully restated.

146. Plaintiff brings this claim against Defendants individually and on behalf of members of the putative Class.

147. William Douglas is a person within the meaning of G.S. § 39A-3(b).

148. Homewise is a person within the meaning of G.S. § 39A-3(b).

149. Defendants charged Plaintiff and the putative Class members transfer fees subject to G.S. 39A-1 *et seq.*

150. Transfer fees are unlawful in North Carolina unless expressly allowed by G.S. § 39A-2(2).

151. The only cognizable and available exception for Defendants to charge the "certification fee" as described in this Complaint is found in G.S. § 39A-2(2)(h), which provides that the following are not transfer fees:

> Any reasonable fee charged for the preparation of statements of unpaid assessments pursuant to G.S. § 47F-3-102(13) or resale certificates or statements of unpaid assessments pursuant to G.S. § 47C-3-102(12).

152. Defendants' fees are not reasonable, because, *inter alia*, the fees bear no relation to the actual cost incurred by Defendants for providing statements of unpaid assessments, are arbitrarily determined, are pure profit to Defendants, are unreasonably high in light of the services provided, and exceed reasonable expectations of sellers.

153. Because Defendants' fees are not reasonable, the entirety of the fees charged to and paid by Plaintiff and the Class violate G.S. § 39A-1, *et seq.*

154. Plaintiff and the Class have been damaged because they have paid transfer fees to Defendants that were unlawfully charged by Defendants.

155. Pursuant to G.S. § 39A-3(b), Defendants entered into an agreement with OAs to impose a private transfer fee obligation on Plaintiff and the class members.

156. As a result, Plaintiff and the Class are entitled to recover from Defendants the entirety of the unlawful fees that they paid, along with any other damages suffered to be proven at trial, and all attorneys' fees, expenses, and costs incurred in this action.

## SECOND CAUSE OF ACTION
### Violation of the North Carolina Unfair and Deceptive Trade Practices
G.S. § 75-1.1, *et seq.*

157. Plaintiff incorporates herein by reference each of the preceding paragraphs as if fully restated.

158. Plaintiff brings this claim against Defendants individually and on behalf of members of the putative Class.

159. At all times relevant herein, Defendants were engaged in commerce in the State of North Carolina.

160. The conduct of Defendants of charging unreasonable fees without any legal basis, under penalty of a cancelled or delayed closing, is against the established public policy of the State of North Carolina, is unfair, unethical, oppressive, unscrupulous, and substantially injurious to the consumers of North Carolina; and has the capacity and tendency to deceive the average consumer.

161. Defendants' violations of the UDTPA include, but are not limited to:

    a. Charging unreasonable fees for the preparation of unpaid assessments;.

    b. Charging unreasonable fees to the transferor that fund post-sale activities and services that exclusively benefit the transferee;

c. Violating the express public policy of this State that favors the marketability of real property and the transferability of interests in real property;

d. Unfairly charging fees for preparation of statements that bear no relation to the actual cost of providing the statements;

e. Unfairly charging fees for preparation of statements that exceeded the reasonable expectation of consumers such as Plaintiffs and the members of the putative Class;

f. Deceptively claiming that "transfer fees" are legally owed when Defendants had no legal basis to claim the amount owed; and

g. Undertaking actions which Defendants knew, or should have known, offends well-established public policy, state law, and was otherwise unfair, deceptive, misleading, coercive, and substantially injurious to consumers such as Plaintiff.

162. The matters alleged herein were done willfully, or with the conscious disregard of the rights of Plaintiff and each member of the Class.

163. Plaintiff and the Class suffered actual injury as a result of Defendants' unfair actions. Such injury consists of the gross overpayment for services rendered by Defendants and other damages as will be shown at trial of this action.

164. Defendants' actions were in or affecting commerce and constitute unfair and deceptive trade practices, which are proscribed by Chapter 75 of the North Carolina General Statutes.

165. Plaintiff and each member of the Class have been damaged and are entitled to recover treble damages, costs, and attorneys' fees incurred in this action.

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation

166. Plaintiff incorporates herein by reference each of the preceding paragraphs as if fully restated.

167. Plaintiff brings this claim against Defendants individually and on behalf of members of the putative Class.

168. Defendants made material representations and/or caused representations to be made to Plaintiff and the Class members in closing documents that the "transfer fee" or other similar fee charged for the preparation of statements of unpaid assessments was lawfully owed and "due".

169. When Defendants made these representations and/or caused these representations to be made, Defendants knew that the fees charged were unreasonable or had a reckless disregard for whether the fees were unreasonable.

170. Defendants knew or ought to have known that Plaintiff and the Class members were relying on the representations.

171. In reliance upon the material representations, Plaintiff and Class members used their funds to make payments to Defendants when the unreasonable fees charged for preparation of statements of unpaid assessments constituted unlawful transfer fees and were therefore barred by statute.

172. Plaintiff and Class members could not have discovered Defendants' misrepresentations upon the exercise of reasonable inquiry, especially given that

they only learned of the unreasonable charges by Defendants at the time of closing, and have no opportunity to investigate the basis for Defendants' charges

173. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff and Class members have been damaged as set forth in this complaint.

174. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff and Class members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, including punitive damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

### FOURTH CAUSE OF ACTION
### Violation of the North Carolina
### Debt Collection Act
### G.S. § 75-50 *et seq.*

175. Plaintiff incorporates herein by reference each of the preceding paragraphs as if fully restated.

176. Plaintiff brings this claim against Defendants individually and on behalf of members of the putative Class.

177. Plaintiff and each Class Member are a "consumer" as that term is defined by N.C. Gen. Stat. § 75-50.

178. The amounts purportedly owed to Defendants by Plaintiff and each member of the Proposed Class is a "debt," as that term is defined by N.C.G.S. § 75-50.

179. At all times relevant to this action, Defendant William Douglas, in the ordinary course of business as a property management company engaged in acts or practices affecting commerce within the meaning of N.C.G.S. § 75-1.1.

180. At all times relevant to this action, Defendant HomeWise, in the ordinary course of business as a software company rendering services to consumers engaged in acts or practices affecting commerce within the meaning of N.C.G.S. § 75-1.1

181. Defendants, in seeking to recover fees for unpaid assessment statements, are "debt collectors" as defined by the North Carolina Debt Collection Act ("NCDCA"), N.C.G.S. § 75-50.

182. Defendants' actions described above constitute the collection of a "debt" under N.C.G.S. § 75-50.

183. Defendants are subject to the requirements of N.C.G.S. § 75-50 et seq., that prohibits certain activities by debt collectors.

184. Defendants violated N.C.G.S. § 75-51 by collecting or attempting to collect debt by means of unfair threats, coercions, or attempts to coerce, including by collecting or attempting to collect debt by threatening to take and actually taking action not permitted by law.

185. Defendants violated N.C.G.S. § 75-51(8) by threatening to take and taking actions not permitted by law, including, inter alia, assessing and collecting fees for unpaid assessment statements without a legal justification.

186. Defendants violated N.C.G.S. § 75-54 by collecting or attempting to collect a debt by means of fraudulent, deceptive, and/or misleading representations, including, inter alia, claiming that fees for unpaid assessment statements were owed without a legal justification.

187. Defendants violated N.C.G.S. § 75-54 by collecting or attempting to collect a debt by means of fraudulent, deceptive, and/or misleading representations, including, inter alia, assessing fees for unpaid assessment statements without a legal justification.

188. The sending of the Closing Letter that asserts the "transfer fees" are due and owing and attempting to collect those amounts when they were not owed violates N.C.G.S. § 75-50 *et seq.*

189. Defendants violated N.C.G.S. § 75-55 by collecting or attempting to collect debt by using unconscionable means.

190. Defendants violated N.C.G.S. § 75-55 by collecting or attempting to collect debt by using unconscionable means by representing that Plaintiff and Class Members owed unreasonable fees for unpaid assessment statements within the closing statements.

191. Defendants violated N.C.G.S. § 75-55 by collecting or attempting to collect debt by using unconscionable means by representing that Plaintiff and Class Members owed unreasonable fees for unpaid assessment statements when such unreasonable fees are against the public policy of North Carolina, and because

absent payment of Defendants' unreasonable fees the real estate transaction cannot close.

192. A violation of N.C.G.S § 39A-1 *et seq* constitutes an unfair debt collection attempt under N.C.G.S.§ 75-50 *et seq*.

193. Defendants' actions in violation of North Carolina's Unfair Debt Collection Act were willful.

194. Plaintiff and each member of the Class were injured by Defendants' actions and are entitled to actual damages to be established at trial as well as statutory damages per violation in an amount ranging from $500.00 to $4,000.00 per violation resulting from each of Defendants' unfair debt collection practices pursuant to N.C.G.S. §75-56.

195. Plaintiff and each member of the Class were injured and sustained damages by Defendants' actions and are entitled to actual damages to be established at trial as well as statutory damages for each violation in the maximum amount allowed by law, as well as reasonable attorneys' fees for an amount in excess of $25,000.00.

196. Plaintiff and each member of the Class are also entitled to recover treble damages pursuant to this claim.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**

197. Plaintiff incorporates herein by reference each of the preceding paragraphs as if fully restated.

198. Plaintiff brings this claim against Defendants individually and on behalf of members of the putative Class.

199. No contract existed between Plaintiff and each member of the putative Class, and Defendants.

200. Plaintiff and each member of the putative Class conferred benefits on Defendants by paying the Resale Fees, which were received by Defendants.

201. Defendants consciously accepted the Resale Fees and the Resale Fees were not conferred gratuitously or by an interference in the affairs of any other entity.

202. It would be unjust for Defendants to retain the Resale Fees paid by Plaintiff and each member of the putative Class.

**SIXTH CAUSE OF ACTION**
**Petition for Declaratory Judgment**
**G.S. § 1-253, *et seq.***

203. Plaintiff incorporates herein by reference each of the preceding paragraphs as if fully restated.

204. Plaintiff brings this claim against Defendants individually and on behalf of members of the putative Class.

205. Plaintiff and the members of the Class file this petition for a Declaratory Judgment under G.S. Chapter 1, Article 25, and the Court has jurisdiction of this matter under that statute.

206. Plaintiff and the members of the Class have an actual controversy with

Defendants regarding whether the fees charged by Defendants are reasonable for confirming that a seller is current on his or her OAs assessment payments.

207.     Upon information and belief, Defendants charged the same, or similar amounts to Plaintiff and each member of the class upon the closing of the sale of their respective properties.

208.     G.S. § 39A-1, *et seq* provides that transfer fees are prohibited in North Carolina.

209.     But for an express exception in G.S. § 39A-2(2)(h), Defendants would never be allowed to charge a fee for confirming that a seller is current on his or her assessment payments.

210.     G.S. § 39A-2(2)(h), however, provides that for purposes of Chapter 39A, the following fee is not considered a transfer fee:

> Any reasonable fee charged for the preparation of statements of unpaid assessments pursuant to G.S. § 47F-3-102(13) or resale certificates or statements of unpaid assessments pursuant to G.S. § 47C-3-102(12).

211.     The fee charged by Defendants to provide these services is not reasonable because it bears no relation to Defendants' actual costs for performing these services, among other reasons.

212.     Therefore, Plaintiff and the Class seek a declaratory judgment that the fee charged by Defendants to provide these services is unreasonable and violates G.S. § 39A-2(2)(h).

## SEVENTH CAUSE OF ACTION
### Civil Conspiracy

213. Plaintiff incorporates herein by reference each of the preceding paragraphs as if fully set forth herein.

214. At all times relevant, there existed a conspiracy between and among Defendants William Douglas and HomeWise to charge consumers amounts for statements of unpaid assessments that were unreasonable and unlawful.

215. This conspiracy and agreement, as set forth herein, was to do an unlawful act, or to do a lawful act in an unlawful way.

216. William Douglas committed acts in furtherance of the conspiracy including, but not limited to, sending Plaintiff and the class members a "Closing Letter" that stated amounts were "due" and "payable" which in fact were not owed, charging amounts for the preparation of unpaid assessments which were unreasonable, and by charging sellers for services that are actually rendered to buyers without disclosing as much.

217. HomeWise committed acts in furtherance of the conspiracy including, but not limited to, preparing the form document titled "Closing Letter" which represents that amounts are "due" and "payable" to Defendants which are in fact not due, and by charging amounts for the preparation of unpaid assessments which were unreasonable.

218. As a direct, proximate, and foreseeable result of the acts by William Douglas and HomeWise, Plaintiff and the consumers have suffered damages in amounts exceeding $25,000, said amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed Class respectfully request that this Court:

1. Certify the Class and Subclass, appoint Plaintiff as class representative and Plaintiff's counsel as class counsel;

2. Award Plaintiff and each member of the Class and Subclass compensatory damages in an amount to be determined at trial;

3. Treble the actual damages awarded to Plaintiff and each member of the Class and Subclass in accordance with G.S. §75-1.1;

4. Award Plaintiff and each member of the Class and Subclass civil penalties of not less than $500 and not greater than $4,000 for each violation in accordance with G.S. § 75-50 *et seq.*;

5. Award attorneys' fees, expenses, costs, and interest to Plaintiff and members of the Class pursuant to G.S. §§ 75-16.1, 39A-3, and other applicable law;

6. Tax the costs of this action to Defendants jointly and severally;

7. Allow a trial by jury on all issues so triable; and

8. Grant Plaintiff and the members of the Proposed Class such other and further relief as the Court deems just and proper.


Respectfully submitted on this 24ᵗʰ day of September, 2020.

_Jerey Willcovo_
Scott C. Harris, Bar No. 35328

37

Patrick M. Wallace, Bar No. 48138
Jeremy R. Williams, Bar No. 48162
**WHITFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
scott@whitfieldbryson.com
pat@whitfieldbryson.com
jeremy@whitfieldbryson.com

## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff hereby certifies that he has this day caused a copy of the foregoing *First Amended Complaint* to be deposited, into the exclusive care, custody and control of the United States Postal Service to be sent via First Class Return Receipt Certified Mail to the following :

Jeffrey B. Kuykendal
McAngus Goudelock & Courie, PLLC
Post Office Box 30307
Charlotte, NC 28230
Jeffrey.kuykendal@mcglaw.com

*Counsel for Defendant William Douglas Management, Inc.*

Date: September 24, 2020.

Scott C. Harris, NC Bar #: 35328
Patrick M. Wallace, NC Bar #: 48138
Jeremy R. Williams, NC Bar #: 48162
**WHITFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
scott@whitfieldbryson.com
pat@whitfieldbryson.com
jeremy@whitfieldbryson.com

EXHIBIT A

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20-CVS-8415

SUSAN K. CARPENTER, TRUSTEE OF
THE H. JOE KING, JR. REVOCABLE
TRUST, ON BEHALF OF ITSELF AND
OTHERS SIMILARLY SITUATED,

       Plaintiff,

v.

WILLIAM DOUGLAS MANAGEMENT,
INC.,

       Defendant.

**DEFENDANT WILLIAM DOUGLAS
MANAGEMENT, INC.'S RESPONSE
TO PLAINTIFF'S REQUESTS FOR
ADMISSION**

Defendant, WILLIAM DOUGLAS MANAGEMENT, INC., by and through undersigned

counsel, hereby responds to Plaintiff's *First Set of Requests for Admission* as follows:

## GENERAL OBJECTIONS

1.    WILLIAM DOUGLAS MANAGEMENT, INC. objects to the Requests to the

extent that they seek information and/or documents that are protected from discovery by the

attorney-client privilege, the work product doctrine and/or any other applicable privilege,

doctrine, exemption or immunity. The production of any document otherwise protected by the

attorney-client, work product, or other privilege is not and should not be considered a waiver of

any privilege or objection to production.

2.    WILLIAM DOUGLAS MANAGEMENT, INC. objects to the Requests to the

extent that they require the disclosure of confidential, proprietary, or otherwise protected

information.

3.    WILLIAM DOUGLAS MANAGEMENT, INC. objects to the Requests to the

extent that they seek information that is not relevant to the subject matter involved in the pending

action and not reasonably calculated to lead to the discovery of admissible evidence.

4.      WILLIAM DOUGLAS MANAGEMENT, INC. objects to the Requests to the extent that they require it to provide or search for any information that is not within its possession and/or is already possessed by Plaintiff, Plaintiff's counsel, or persons/entities who are not parties to this litigation.

5.      WILLIAM DOUGLAS MANAGEMENT, INC. reserves the right to supplement these Answers as discovery and investigation continue.

## RESPONSES TO REQUESTS FOR ADMISSION

1.      Admit that you created the document attached as Exhibit A to these Requests for Admission.

**RESPONSE: Admitted.**

2.      Admit that the document attached as Exhibit A contains a request for payment in the amount of $215.

**RESPONSE: Admitted.**

3.      Admit that you were paid the $215 charged by the document attached as Exhibit A.

**RESPONSE: Admitted.**

4.      Admit that the $215 charged to Plaintiff was for a certification that Plaintiff was not delinquent on his HOA assessments.

**RESPONSE: It is admitted the $215 charged was for multiple certifications and a rush fee related to whether the seller was delinquent on HOA assessments. Otherwise, denied.**

5.      Admit that the certification you provided was a statement of unpaid assessments.

**RESPONSE: Admitted.**

6. Admit that you contend the $215 charge to Plaintiff was allowable under G.S. § 39A-1, et seq.

**RESPONSE: Admitted.**

7. Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(a).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

8. Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(b).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

9. Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(c).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

10. Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(d).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

11. Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(e).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an**

3

admission of fact. Subject to and notwithstanding said objection, admitted.

12.     Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(f).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

13.     Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(g).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

14.     Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(i).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

15.     Admit that the $215 fee you charged to Plaintiff was not a fee charged under G.S. § 39A-2(2)(j).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

16.     Admit that the $215 fee you charged to Plaintiff was a fee charged under G.S. § 39A-2(2)(h).

**RESPONSE: Objection. This request seeks a legal conclusion rather than an admission of fact. Subject to and notwithstanding said objection, admitted.**

17.     Admit that you have charged fees to other individuals for the preparation of statements of unpaid assessments in the last four years.

4

**RESPONSE: Objection. This request is irrelevant and not likely to lead to the discovery of relevant information. Subject to and notwithstanding said objection, admitted.**

18. Admit that those fees that you charged to other individuals for the preparation of statements of unpaid assessments in the last four years were charged under G.S. § 39A-2(2)(h).

**RESPONSE: Objection. This request is irrelevant and not likely to lead to the discovery of relevant information. Subject to and notwithstanding said objection, it is admitted other individuals were charged for the preparation of statements of unpaid assessments in the last four years under G.S. § 39A-2(2)(h). Otherwise, denied.**

19. Admit that the fees you charged to other individuals for the preparation of statements of unpaid assessments in the last four years were not charged under G.S. § 39A-2(2)(a-i, or j).

**RESPONSE: Objection. This request is irrelevant and not likely to lead to the discovery of relevant information. Subject to and notwithstanding said objection, denied.**

20. Admit that you have not charged fees to other individuals under G.S. G.S. § 39A-2(2)(a-i, and j) in the last four years.

**RESPONSE: Objection. This request is irrelevant and not likely to lead to the discovery of relevant information. Subject to and notwithstanding said objection, denied.**

21. Admit that you did not pay any amount of the $215 fee you charged Plaintiff to any third parties.

**RESPONSE: Admitted.**

22. Admit that you did not pay any amount of the fee you charged to other individuals under G.S. § 39A-2(2)(h) to any third parties.

**RESPONSE:** Objection. This request is irrelevant and not likely to lead to the discovery of relevant information. Subject to and notwithstanding said objection, admitted.

This the 2nd day of September, 2020.

JEFFREY B. KUYKENDAL
Bar No: 37693
Attorney for William Douglas Management,
Inc.
McAngus Goudelock & Courie, PLLC
Post Office Box 30307
Charlotte, North Carolina 28230
(704) 643-6303
jeffrey.kuykendal@mgclaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record by facsimile and by depositing a copy of the same in an official depository of the U.S. Mail in a postage-paid envelope addressed as follows:

> Scott C. Harris
> Patrick M. Wallace
> Jeremy R. Williams
> Whitfield Bryson & Mason, LLP
> 900 West Morgan Street
> Raleigh, North Carolina 27603
> Attorney for Susan K. Carpenter

This the 2nd day of September, 2020.

JEFFREY B. KUYKENDAL


EXHIBIT B

# Closing Letter Update
## Lexington Commons Homeowners' Association Ltd.
## William Douglas Property Management

**Property Information:**
8917 Hunter Ridge Dr
Charlotte, NC 28226-4687
Seller: HARMON JOE KING, ESTATE
Buyer: NADYA VOLNY

**Requestor:**
Lancaster & Trotter, P.A.
Jennifer Peters
704-525-1702
Estimated Closing Date: 03-30-2020

## General Information

| | |
|---|---|
| This information is good through | 04-08-2020 |
| Is this account in collections? | No |
| What is the current regular assessment against the unit? | 173.26 |
| What is the frequency of the assessment charge? | Monthly |
| The regular assessment is paid through: | 03-31-2020 |
| The regular assessment is next due: | 04-01-2020 |
| What day of the month are regular assessments due? | 1st |
| How many days after the due date is the regular assessment considered delinquent? | 15 |
| The penalty for delinquent assessments is: | $20.00 per month |

## Specific Fees Due To Lexington Commons Homeowners' Association Ltd.

| | |
|---|---|
| Closing agent is required to collect the following number of additional regular assessments at closing: | 1 |
| Are there any current special assessments or governing body approved special assessments, against units within the association? If yes, a comment is provided. | No |
| Owner's current balance due (you may total the owners balance due using the breakdown below): | $0.00 |

## General Association Information

| | |
|---|---|
| Are there any violations against this unit? | No |
| Is the association or the developer (if the project has not been turned over to the homeowners association) involved in any current or pending litigation? If yes, a comment is required. (Do not include neighbor disputes or rights of quiet enjoyment, litigation where the claim amount is known and the insurance carrier will provide defense and coverage, or where the HOA is named as a plaintiff in a foreclosure action or to collect past due assessments). | No |

## Insurance Information

| | |
|---|---|
| Insurance broker's or agent's company name: | IPFS Corporation |
| Identify the insurance agent's name: | J.M. Hamilton & Associates |
| Insurance agent's phone number: | 704-927-1165 |
| Insurance agent's fax number: | |
| Insurance agent's email address: | |

# Closing Letter Update
## Lexington Commons Homeowners' Association Ltd.
## William Douglas Property Management

**Property Information:**
8917 Hunter Ridge Dr
Charlotte, NC 28226-4687
Seller: HARMON JOE KING, ESTATE
Buyer: NADYA VOLNY

**Requestor:**
Lancaster & Trotter, P.A.
Jennifer Peters
704-525-1702
Estimated Closing Date: 03-30-2020

*Michael Rayfield*

**Michael Rayfield, Accounting Staff**

**Date: 03-27-2020**

**William Douglas Property Management**

**Phone: 704-347-8900**

# Closing Letter Update
## Lexington Commons Homeowners' Association Ltd.
## William Douglas Property Management

**Property Information:**
8917 Hunter Ridge Dr
Charlotte, NC 28226-4687
Seller: HARMON JOE KING, ESTATE
Buyer: NADYA VOLNY

**Requestor:**
Lancaster & Trotter, P.A.
Jennifer Peters
704-525-1702
Estimated Closing Date: 03-30-2020

## Fee Summary

| Amounts Prepaid | | |
|---|---|---|
| | Total | **$0.00** |

| Fees Due to William Douglas Property Management | | |
|---|---|---|
| | Rush Fee | $40.00 |
| | Closing Letter Update | $25.00 |
| | Closing Letter and Documents Package (Includes Transfer Fee) | $150.00 |
| | Total | **$215.00** |

| Fees Due to Lexington Commons Homeowners' Association Ltd. | | |
|---|---|---|
| | Prepaid Assessments | $173.26 |
| | Total | **$173.26** |

| Fees Due to HomeWiseDocs.com (Service/Delivery Fees) | | |
|---|---|---|
| | Rush Fee | $10.00 |
| | Closing Letter Update | $5.00 |
| | Closing Letter and Documents Package (Includes Transfer Fee) | $25.00 |
| | Total | **$40.00** |

# Closing Letter Update
## Lexington Commons Homeowners' Association Ltd.
### William Douglas Property Management

**Property Information:**
8917 Hunter Ridge Dr
Charlotte, NC 28226-4687
Seller: HARMON JOE KING, ESTATE
Buyer: NADYA VOLNY

**Requestor:**
Lancaster & Trotter, P.A.
Jennifer Peters
704-525-1702
Estimated Closing Date: 03-30-2020

**PLEASE RETURN THIS FORM WITH YOUR CHECK AND CERTIFIED COPIES OF THE CLOSING DISCLOSURE FORM (FORMERLY THE HUD-1 FORM) AND THE GRANT OR WARRANTY DEED. PLEASE INDICATE CONFIRMATION NUMBER 6BZ68CPL2-up1 ON THE CHECK TO ENSURE PAYMENT IS CREDITED PROPERLY.**

| Fees Due to William Douglas Property Management | | |
|---|---|---|
| | Rush Fee | $40.00 |
| | Closing Letter and Documents Package (Includes Transfer Fee) | $150.00 |
| | Closing Letter Update | $25.00 |
| | **Total** | **$215.00** |

| Fees Due to Lexington Commons Homeowners' Association Ltd. | | |
|---|---|---|
| | Prepaid Assessments | $173.26 |
| | **Total** | **$173.26** |

| Fees Due to HomeWiseDocs.com (Service/Delivery Fees) | | |
|---|---|---|
| | Rush Fee | $10.00 |
| | Closing Letter and Documents Package (Includes Transfer Fee) | $25.00 |
| | Closing Letter Update | $5.00 |
| | **Total** | **$40.00** |

**Include this confirmation number 6BZ68CPL2-up1 on the check for $215.00 payable to and send to the address below.**

William Douglas Property Management

4523 Park Rd Suite 201A

Charlotte, NC 28209

**Include this confirmation number 6BZ68CPL2-up1 on the check for $173.26 payable to and send to the address below.**

Lexington Commons Homeowners' Association Ltd.

4523 Park Rd Suite 201A



## Closing Letter Update
### Lexington Commons Homeowners' Association Ltd.
### William Douglas Property Management

**Property Information:**
8917 Hunter Ridge Dr
Charlotte, NC 28226-4687
Seller: HARMON JOE KING, ESTATE
Buyer: NADYA VOLNY

Charlotte, NC 28209

**Requestor:**
Lancaster & Trotter, P.A.
Jennifer Peters
704-525-1702
Estimated Closing Date: 03-30-2020

**Include this confirmation number 6BZ68CPL2-up1 on the check for $40.00 payable to and send to the address below. \*\*Must return the HomeWiseDocs.com Invoice below with payment.\*\***

HomeWiseDocs.com

5520 Kietzke Lane Suite 200

Reno, NV 89511

# HomeWiseDocs.com Invoice

Must be returned with check made payable to: HomeWiseDocs.com

Return to:

**HomeWiseDocs.com**
**5520 Kietzke Lane Suite 200**
**Reno, NV 89511**

------------------------------------------------ fold here ------------------------------------------------

------------------------------------------------ fold here ------------------------------------------------

Order: **6BZ68CPL2-up1**

Property Information:
  8917 Hunter Ridge Dr
  Charlotte, NC 28226-4687

| **Fees due to HomeWiseDocs.com: $40.00** |

**NOTE:Other fees might be due and payable to the Management Company and/or HOA.
This page is available for your convenience to return payment to HomeWiseDocs.com.

# Closing Letter Update
## Lexington Commons Homeowners' Association Ltd.
### William Douglas Property Management

**Property Information:**
8917 Hunter Ridge Dr
Charlotte, NC 28226-4687
Seller: HARMON JOE KING, ESTATE
Buyer: NADYA  VOLNY

**Requestor:**
Lancaster & Trotter, P.A.
Jennifer Peters
4430 Park Road
Charlotte, NC 28209
704-525-1702
jennifer@ltp-law.com

## Buyer and Seller Contact Information

**Seller's New Address:**

**Buyer's Address:**

Phone:
Email: jennifer@ltp-law.com

Phone:
Email: jennifer@ltp-law.com
Is buyer occupant? Yes

## Closing Information

File/Escrow Number:
Estimated Close Date: 03-30-2020
Homewise Confirmation Number: 6BZ68CPL2-up1

Sales Price:
Closing Date:
Homewise Transaction ID: 4979569

## Status Information

Date of Order: 03-26-2020
Board Approval Date:
Order Complete Date: 03-27-2020

Order Retrieved Date:
Inspection Date:

## Community Manager Information

Company: William Douglas Property Management
Completed By: Michael Rayfield
Primary Contact: Michael Rayfield
Address:
4523 Park Rd Suite 201A
Charlotte, NC 28209
Phone: 704-347-8900
Fax:
Email: hw@wmdouglas.com


EXHIBIT C

# Closing Disclosure

## Closing Information

| | | |
|---|---|---|
| Date Issued | 04/02/2020 | |
| Closing Date | 04/02/2020 | |
| Disbursement Date | 04/02/2020 | |
| Settlement Agent | Norwood, Armstrong, & Stokes, PLLC | |
| File # | 20-0165 | |
| Property | 1236 D Archdale Drive | |
| | Charlotte, NC 28217 | |
| Sale Price | $125,000 | |

**Seller** Susan K. Carpenter, as Trustee of the H. Joe King, Jr. Revocable Trust
1236 D Archdale Drive
Charlotte, NC 28217

## Summaries of Transactions

### SELLER'S TRANSACTION

| | | |
|---|---|---|
| **M. Due to Seller at Closing** | | **$125,000.00** |
| 01 Sale Price of Property | | $125,000.00 |
| 02 Sale Price of Any Personal Property Included in Sale | | |
| 03 | | |
| 04 | | |
| 05 | | |
| 06 | | |
| 07 | | |
| 08 | | |

**Adjustments for Items Paid by Seller in Advance**

| | | |
|---|---|---|
| 09 City/Town Taxes | | |
| 10 County Taxes | | |
| 11 Assessments | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |

| | | |
|---|---|---|
| **N. Due from Seller at Closing** | | **$9,480.36** |
| 01 Excess Deposit | | |
| 02 Closing Costs Paid at Closing (J) | | $7,816.93 |
| 03 Existing Loan(s) Assumed or Taken Subject to | | |
| 04 Payoff of First Mortgage Loan | | |
| 05 Payoff of Second Mortgage Loan | | |
| 06 Due Diligence | | $300.00 |
| 07 HOA Dues Proration | 04/01/20-04/01/20 | $6.90 |
| 08 Seller Credit | | $1,130.00 |
| 09 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |

**Adjustments for Items Unpaid by Seller**

| | | |
|---|---|---|
| 14 City/Town Taxes | | |
| 15 County Taxes | 01/01/20 to 04/02/20 | $226.53 |
| 16 Assessments | | |
| 17 | | |
| 18 | | |
| 19 | | |

### CALCULATION

| | | |
|---|---|---|
| Total Due to Seller at Closing (M) | | $125,000.00 |
| Total Due from Seller at Closing (N) | | -$9,480.36 |
| Cash [ ] From [x] To Seller | | **$115,519.64** |

## Contact Information

### REAL ESTATE BROKER (B)

| | |
|---|---|
| Name | Giving Tree Realty |
| Address | 1244 East Blvd. Charlotte, NC 28203 |
| NC License ID | C19952 |
| Contact | James Massman |
| Contact NC License ID | 137887 |
| Email | jb.massman@givingtreerealty.com |
| Phone | |

### REAL ESTATE BROKER (S)

| | |
|---|---|
| Name | EXP Realty LLC |
| Address | 10130 Perimeter Parkway, #200 Charlotte, NC 28216 |
| NC License ID | C22682 |
| Contact | Megan N Huthert |
| Contact NC License ID | 285571 |
| Email | megan@hutherthomes.com |
| Phone | |

### SETTLEMENT AGENT

| | |
|---|---|
| Name | Norwood, Armstrong, & Stokes, PLLC |
| Address | 2133 Southend Drive Suite 108 Charlotte, NC 28203 |
| NC License ID | |
| Contact | Kate Williams |
| Contact NC License ID | |
| Email | kate@norwoodarmstronglaw.com |
| Phone | |

# Closing Cost Details

| Loan Costs | Seller-Paid | |
|---|---|---|
| | At Closing | Before Closing |
| **A. Origination Charges** | | |
| 01  % of Loan Amount (Points) | | |
| 02  Commitment Fee to American Security Mortgage Corp | | |
| 03 | | |
| 04 | | |
| 05 | | |
| **B. Services Borrower Did Not Shop For** | | |
| 01  Appraisal Fee to ASMC FBO REALTY CONSULTING | | |
| 02  Condo questionnaire to ASMC fbo Carriage House | | |
| 03  Credit Report to ASMC FBO CREDIT PLUS | | |
| 04  Flood Certification to ASMC FBO ServiceLink National Flood | | |
| 05 | | |
| **C. Services Borrower Did Shop For** | | |
| 01  Title - Admin Fee to Norwood, Armstrong, & Stokes, PLLC | | |
| 02  Title - Attorney Fee For Loan Closing to Norwood, Armstrong, & Stokes, PLLC | | |
| 03  Title - Document Preparation to Norwood, Armstrong, & Stokes, PLLC | $350.00 | |
| 04  Title - Lender's Title Insurance to Tryon Title Agency, LLC | | |
| 05  Title - Mail Away Fee to Norwood, Armstrong, & Stokes, PLLC | | |
| 06  Title - Payoff/Wire Handling Fee to Norwood, Armstrong, & Stokes, PLLC | $75.00 | |
| 07  Title - Title Abstract and Examination to Norwood, Armstrong, & Stokes, PLLC | | |
| 08  Title - Title Update/Recording Service to Norwood, Armstrong, & Stokes, PLLC | | |

| Other Costs | At Closing | Before Closing |
|---|---|---|
| **E. Taxes and Other Government Fees** | | |
| 01  Recording Fees                    Deed:    Mortgage: | | |
| 02  E-Recording Fee to Mecklenburg Register of Deeds | | |
| 03  Transfer Tax to Mecklenburg Register of Deeds | $250.00 | |
| **F. Prepaids** | | |
| 01  Homeowner's Insurance Premium (  mo.) | | |
| 02  Mortgage Insurance Premium (  mo.) | | |
| 03  Prepaid Interest (      per day from          to        ) | | |
| 04  Property Taxes (  mo.) | | |
| 05 | | |
| **G. Initial Escrow Payment at Closing** | | |
| 01  Homeowner's Insurance | | |
| 02  Mortgage Insurance | | |
| 03  Property Taxes | | |
| 04  Aggregate Adjustment | | |
| 05 | | |
| 06 | | |
| 07 | | |
| **H. Other** | | |
| 01  Commission - Listing Agent to EXP Realty LLC | $3,125.00 | |
| 02  Commission - Selling Agent to Giving Tree Realty | $3,125.00 | |
| 03  HOA Doc Prep Fee to HomeWiseDocs.com | $25.00 | |
| 04  HOA Dues - April to The Carriage House Homeowners' Association Ltd. | | |
| 05  HOA Dues - March to The Carriage House Homeowners' Association Ltd. | $206.93 | |
| 06  HOA Transfer Fee to William Doug'as Property Management | $150.00 | |
| 07  home warranty to Home Warranty of America | $510.00 | |
| 08  Title - Owner's Title Insurance (optional) to Tryon Title Agency, LLC | | |
| 09  Transaction Fee to Giving Tree Realty | | |
| **J. TOTAL CLOSING COSTS** | $7,816.93 | |

EXHIBIT D

# Closing Letter
## The Carriage House Homeowners' Association Ltd.
## William Douglas Property Management

**Property Information:**
1236 Archdale Dr Unit: Apt D
Charlotte, NC 28217-4356
Seller: Susan Carpenter
Buyer: Peter Kalambayi

**Requestor:**
Norwood Armstrong & Stokes, PLLC
Natalia Asnaymer
2133 SOUTHEND DR
CHARLOTTE, NC 28203
704-529-1100
natalia@norwoodarmstronglaw.com

## Buyer and Seller Contact Information

**Seller's New Address:**

Phone: 704-529-1100
Email: natalia@norwoodarmstronglaw.com

**Buyer's Address:**
1236 Archdale Drive
Charlotte, NC 28217
Phone: 704-529-1100
Email: natalia@norwoodarmstronglaw.com
Is buyer occupant? Yes

## Closing Information

File/Escrow Number:
Estimated Close Date: 03-31-2020
Homewise Confirmation Number: YYF9XLRGF

Sales Price: 127000.00
Closing Date:
Homewise Transaction ID: 4864875

## Status Information

Date of Order: 02-18-2020
Board Approval Date:
Order Complete Date: 03-02-2020

Order Retrieved Date:
Inspection Date:

## Community Manager Information

Company: William Douglas Property Management
Completed By: Michael Rayfield
Primary Contact: Michael Rayfield
Address:
4523 Park Rd Suite 201A
Charlotte, NC 28209
Phone: 704-347-8900
Fax:
Email: hw@wmdouglas.com



# ⊞ HomeWise    **Homeowner's Association Question Letter**
## The Carriage House Homeowners' Association Ltd.

Borrower: PETER KALAMBAYI
Address: 1236 Archdale Dr Unit: Apt D
Charlotte, NC 28217-4356

Certification Number: ZY5H3FSMJ
Date Project Last Updated: 03-02-2020
Date Ordered: 02-25-2020
Federal Tax ID #: 56-1247148

---

## Project Agency Eligibility Data

| | | |
|---|---|---|
| 1. | This association is a: | Condo |
| 2. | Are the units within this project attached or detached? | Attached |
| 3. | Is the project managed like a hotel or motel, even though the units are individually owned? | No |
| 4. | Please check applicable boxes below if any of the comments are true regarding the project: | |

    ☐ Daily cleaning service is offered

    ☐ Interior doors that adjoin other units

    ☐ Project advertizes rental rates

    ☐ Project has central key systems

    ☐ Project has a central phone system

    ☐ Project has restrictions on interior decorating

    ☐ Project has a registration service

    ☐ Project is a conversion of a hotel or motel or other similar transient properties

    ☐ Project is located in a resort area (specific resort area)

    ☐ Project offers franchise agreements

    ☐ Room service is offered

    ☐ The Project includes the word hotel or motel in its name

    ☐ Units are typically sold furnished

    ☐ Units can be leased on a daily or weekly basis

    ☐ Units do not contain full-sized kitchens

| | | |
|---|---|---|
| 5. | Does this association have a rental desk, short term occupancy or daily cleaning services? | No |
| 6. | Is the association a timeshare or segmented ownership project? | No |
| 7. | Is there an onsite rental office? | No |
| 8. | Does the association have an established rental pooling agreement that requires unit owners to either rent their units or give the management firm control over the occupancy of the units? | No |
| 9. | Does the project require "blackout dates" or continuous occupancy limitations for the unit owners? | No |
| 10. | Are any of the units under 400 square feet in size? | No |
| 11. | Is the association a houseboat project? | No |

| | | |
|---|---|---|
| **12.** | Is the project a common interest apartment or community apartment project? (This is a project that is owned by several owners as tenants in common or by the homeowners association in which individuals have an undivided interest in a residential apartment and have the right to exclusive occupancy of a specific apartment building.) | No |
| **13.** | Is the project an investment security (defined as projects that have documents on file with the Securities and Exchange Commission or projects where unit ownership is characterized as an investment opportunity). | No |
| **14.** | Does the project have any non-incidental business operations owned or operated by the homeowners association (such as but not limited to a restaurant, spa, health club, etc.)? | No |
| **15.** | Is the project a legal non-conforming use of land? (Zoning requirements must allow the project to be rebuilt to encompass the same number of units or density in the event of full or partial destruction. Answer "No" here if the project is legally conforming zoning.) | No |
| **16.** | Are there any manufactured housing units within the project? | No |
| **17.** | Is the project a conversion of an existing building? | Yes |
| | **A.** Define the prior use of the building: | See Comments |
| | **Other** | |
| | **B.** If yes, when did the conversion take place? | unknown |
| | **C.** Is all rehabilitation work complete for the conversion? | Yes |
| | **D.** Is the conversion a "gut rehabilitation" (meaning that the renovation of the property was down to the shell with replacement of all HVAC and electronic components)? | No |
| **18.** | Is the association subject to inclusionary zoning (meaning some or all of the units may have restrictions on them including but not limited to age, income,etc.) which may affect future sales? | No |
| **19.** | Does the association contain any commercial space? (Please define the use of the commercial space in the comments section of this question). | No |
| **20.** | Does the project permit an owner to hold title (or stock ownership and the accompanying occupancy rights, for co-ops) to more than one dwelling unit, with ownership of all units (or shares) evidenced by a single deed and financed by a single mortgage (or share loan)? | No |
| **21.** | Is the project a condominium hotel? | No |
| **22.** | Is this project a site condominium (it contains all detached units but is still zoned as a condominium)? | No |
| **23.** | Is the association an assisted living community providing meal or health care services? If yes, describe the additional services provided in the comments section of this question. | No |
| **24.** | Is any of the common area leased? | No |

## Sales and Construction Status

| | | |
|---|---|---|
| 25. | Are all of the units within the association completed? | Yes |
| 26. | Are all of the common areas completed? | Yes |
| 27. | Is the project subject to additional annexation or phasing? | No |
| 28. | What year was the project built (completed)? | 1978 |
| 29. | Date that control of the homeowners association was turned over or will be turned over to the unit owners: | 1981 |
| 30. | Has control of the association been turned over to the unit owners? | Yes |
| 31. | Is the association subject to a master or umbrella association? | No |
| 32. | The association includes the following amenities: | |
| | **Swimming Pool** | |

## Occupancy Information

| | | |
|---|---|---|
| 33. | Total number of units within the association: | 149 |
| 34. | Total number of units sold and closed within the association: | 149 |
| 35. | Total number of units sold but not closed within the association: | 0 |
| 36. | How many units have onsite mailing addresses? | 75 |
| 37. | How many units have offsite mailing addresses within the association? | 74 |
| 38. | Total number of phases within this association. | Phase data is not tracked because the project is complete |
| 39. | Are there individuals that own more than one unit within the project? | Yes |
| | A. Does any individual or entity own more than 10% of the units within the association? | No |
| | B. List multiple unit owners | |
| | **Owner 1 owns 2 unit(s); Owner 2 owns 2 unit(s); Owner 3 owns 2 unit(s); Owner 4 owns 2 unit(s); Owner 5 owns 2 unit(s); Owner 6 owns 2 unit(s); Owner 7 owns 4 unit(s); Owner 8 owns 2 unit(s); Owner 9 owns 2 unit(s); Owner 10 owns 2 unit(s);** | |
| 40. | Total number of units still owned by the developer: | 0 |
| 41. | Total number of units owned by the developer that are completed and leased by the developer. | 0 |
| 42. | Total number of units owned by the developer that are completed and are actively being sold. | 0 |

**Homeowner's Association Question Letter**
**The Carriage House Homeowners' Association Ltd.**

## Assessments and Budget Information

| | | |
|---|---|---|
| 43. | Please indicate the dollar amount within the association's reserve account: | 220762.49 |
| 44. | Total number of unit owners currently more than 30 days delinquent in homeowner association assessments: | 0 |
| 45. | Total dollar amount of delinquencies (for the unit assessment over 30 days): | 0.00 |
| 46. | Total number of unit owners currently more than 60 days delinquent in homeowner association assessments: | 11 |
| 47. | Total dollar amount of delinquencies (for the unit assessment over 60 days) | 24710.03 |
| | **A.** Assessments range from: | 176.31 |
| | **B.** Assessments range to: | 255.52 |
| | **C.** What is the frequency of the assessment charge? | Monthly |
| 48. | Are the taxes for the individual units included in the H.O.A fees? | No |
| 49. | Are the units separately metered for utilities? | No |
| | **A.** IF the units are NOT separately metered for utilities, are plans in place to install separate meters? | See Comments |
| 50. | Utilities and services included in the unit assessment: | |
| | **Common Area Insurance, Landscaping, Sewer, Water** | |
| 51. | Are there any mortgages outstanding for the association (only include loans secured by real estate)? | No |
| 52. | Total reserves budgeted for the year: | 67542.00 |
| 53. | Is the HOA budget adequate, including funding of replacement reserves for capital expenditures, deferred maintenance (at least 10% of the budget), adequate funding for insurance deductible amounts and allocations for line items pertinent to the type of association? | See Comments |
| 54. | Total income budgeted for the year: | 385921.00 |
| 55. | Is the general maintenance level of the common elements acceptable and is there no deferred maintenance, based on the comments by the appraiser and/or the pictures? | See Comments |
| 56. | Are there recurring transfer fees paid to the developer? | No |

## Title and Ownership Information

| | | |
|---|---|---|
| 57. | Are all units owned fee simple? | Yes |
| 58. | Are any units owned as leasehold estates? | No |
| 59. | Are any of the common areas still owned by the developer? | No |
| 60. | Do the unit owners have sole ownership and the right to use the project's facilities? | Yes |

# Homeowner's Association Question Letter
## The Carriage House Homeowners' Association Ltd.

### Legal Information

| | | |
|---|---|---|
| **61.** | Is there a right of first refusal clause contained within the association's governing documents? | No |
| **62.** | Is the unit part of a condominium regime that provides for common and undivided ownership of common areas by unit owners? | Yes |
| **63.** | Are there any provisions in the condominium project documents that give a condominium unit owner or any other party priority over any rights of the first mortgagee of the condominium unit pursuant to its mortgage in the case of payment to the unit owner of any condemnation or casualty loss that affects either a material portion of the project or the unit securing its mortgage? | See Comments |
| **64.** | Do the legal documents of the Homeowner's Association contain language that protects the first mortgagee rights? | See Comments |
| **65.** | Does the association have Articles of Incorporation and Bylaws? If not what documents are used in lieu of Articles and Bylaws? | Yes |
| **66.** | Is the association or the developer (if the project has not been turned over to the homeowners association) involved in any current or pending litigation? If yes, a comment is required. (Do not include neighbor disputes or rights of quiet enjoyment, litigation where the claim amount is known and the insurance carrier will provide defense and coverage, or where the HOA is named as a plaintiff in a foreclosure action or to collect past due assessments). | No |
| **67.** | Is asbestos, lead-based paint or any other environmental toxin present in any unit or common area of the development? If yes, a comment is required. | See Comments |
| **68.** | If unit is taken over in foreclosure or deed-in-lieu of foreclosure, secondary market agencies (Fannie Mae, Freddie Mac and FHA) allow HOA assessment to have a limited priority over their first lien position. Do the association governing documents or the state's statutes allow for the limited collection of past due assessments priority over the first lien position? | No |
| **69.** | Is the project located in a jurisdiction that has enacted the Uniform Condo Act, Uniform Common Interest Ownership Act or similar statutes that provide for regular common expense assessments? | Yes |
| **70.** | Are the units subject to "private transfer fee covenants" that have been created on or after February 8, 2011 as defined in FHFA regulation 75 FR 49932 ? | No |

### Homeowner Information

| | | |
|---|---|---|
| **71.** | Are there any current special assessments or governing body approved special assessments, against units within the association? If yes, a comment is provided. | No |

### Management Information

| | | |
|---|---|---|
| **72.** | What is the length of the current management contract (in years)? | 1 |
| **73.** | Does the management contract require a penalty for cancellation or an advanced notice of at least ninety days? | No |
| **74.** | Are two or more board members required to authorize disbursements from the reserve account? | Yes |

| | | |
|---|---|---|
| 75. | Does the homeowners association have separate records for the operating and reserve accounts? | Yes |
| 76. | Are monthly bank account statements being sent directly to the homeowners association? | Yes |
| 77. | Does the management firm have the authority to disburse funds from the reserve account? | Yes |

**Insurance Information**

| | | |
|---|---|---|
| 78. | Name of the insurance carrier for the association: | Nationwide Insurance |
| | A. Insurance broker's or agent's company name: | Nationwide |
| | B. Identify the insurance agent's name: | J.M Hamilton |
| | C. Insurance agent's phone number: | 704-364-0833 |
| 79. | Liability limit per occurrence for bodily injury: | view comments |
| 80. | Fidelity bond/employee dishonesty insurance amount: | view comments |
| 81. | Does the owners association carry adequate common area coverage and do all other coverages reflect the character, amenities and risks of the particular development? | See Comments |

**William Douglas Property Management**
**4523 Park Rd Suite 201A**
**Charlotte, NC 28209**

**Michael Rayfield, Accounting Staff**

**William Douglas Property Management**

**Phone: 704-347-8900**

 **HomeWise** **Homeowner's Association Question Letter**
## The Carriage House Homeowners' Association Ltd.

## Comments

Question #17A unknown

Question #37 Offsite addresses may refer to, but are not limited to, rental units, P.O. boxes, second homes or places of employment.

Question #45 There was a $5000.00 insurance deductible that I did not include.

Question #49A unknown

Question #53 We make no warranty as to the adequacy of the budget in regards to reserves and capital expenditures. Budgets are prepared to adequately cover these expenses. Please see the Reserve Study, if available.

Question #55 We make no warranty as to the general maintenance level of the common elements. Please review the appraisal for this information.

Question #63 Please review the governing documents found at HomeWiseDocs.com for this association.

Question #64 Please review the legal documents available on HomeWiseDocs.com.

Question #67 To the best of our knowledge, there is no asbestos, lead-based paint or any other environmental toxins present at this time.

Question #77 W/written authorization

Question #79 Verify liability limit with insurance agent.

Question #80 Verify amount with insurance agent.

Question #81 Contact insurance agent for this information.

THIS DISCLOSURE IS INTENDED STRICTLY FOR THE USE OF REAL ESTATE AND LENDING PROFESSIONALS. THIS INFORMATION, WHILE DEEMED TO COME FROM RELIABLE SOURCES, IS NOT GUARANTEED. PROSPECTIVE BUYERS OF REAL ESTATE SHOULD SEEK APPROPRIATE AND COMPLETE DISCLOSURES FROM THE SELLER OF THE SUBJECT PROPERTY.

THE RESPONSES HEREIN ARE MADE IN GOOD FAITH AND TO THE BEST OF MY ABILITY AS TO THEIR ACCURACY.